## Knight *v.* Allegheny County, Appellant.

Argued October 2, 1952. Before STERN, STEARNE, JONES, BELL and MUSMANNO, JJ.

*John W. Mamula,* Assistant County Solicitor, with him *Nathaniel K. Beck,* County Solicitor, for appellant.

*John A. Metz, Jr.,* with him *Mayer Sniderman* and *Metz & Metz,* for appellees.

Opinion by Mr. Chief Justice Horace Stern, November 10, 1952:

The refusal in this case of the court below to grant a new trial to defendant must be reversed. The trial judge's charge to the jury did not serve, by reason of faults both of commission and omission, to bring about a proper determination of the issue involved.

Plaintiffs, prior to the condemnation of their property, were the owners of a lot fronting 40 feet on the northerly side of West Fifth Avenue in the City of McKeesport, extending back a distance of 72 feet to an alley, and having erected thereon a garage and an old double house containing five rooms and bath on each side, with a semi-finished attic. The house is of frame construction; the side walls are covered with tin and the front and rear walls with brick; a brick porch, 5 to 6 feet in width, ran along the entire front. In connection with the widening of the avenue as part of the construction of the Dravosburg Bridge and its approaches ten feet were taken from the front of the property, thereby eliminating the entire porch and somewhat over four feet from the front of the house itself. The Board of Viewers awarded $8,200 as compensation for these damages. Plaintiffs appealed from this award to the Court of Common Pleas of Allegheny County. At the trial in that court three witnesses testified on their behalf,—Messrs. Brown and Hershberger, real estate experts, who estimated the damages, the one at $18,000 and the other at $17,000,—these valuations being based on the assumption that the property could not, by any construction, be adjusted to the new condition but that the whole house would have to be moved back on the lot,—and Mr. Shack, a contractor and house mover, who testified it would cost $16,275 so to move it; this figure was adopted by these other two witnesses in their estimates. Three wit-

nesses testified on behalf of the County of Allegheny,— Mr. Jordan, an engineer engaged in construction work, who testified that it would be possible to build a new front on the property and make a satisfactory rearrangement of the rooms, Mr. Fees, a building contractor, who testified similarly and that the cost of the work would be $3,980, and Mr. Fahnestock, a real estate expert, who, on the basis of this same theory, estimated the damages at $5,200, representing the difference between the fair market value of the property before and after such reconstruction was made. While the discrepancy between the figures thus presented by the two sets of witnesses would seem at first blush to be exceedingly large, the difference is obviously accounted for by the fact that plaintiffs' witnesses insisted that the house, to have any remaining value at all, would have to be moved back on the lot, an operation which incidentally necessitated the demolition of the garage located at the rear of the property, whereas the witnesses for defendant claimed that a new front could be built with comparatively little resulting depreciation in value. The jury apparently did not resolve the determinative issue thus raised, but instead rendered a verdict of $12,000 together with compensation of $1,380 for delay in payment, or a total of $13,380, the $12,000 obviously representing the halfway mark between the estimates given by plaintiffs' and defendant's witnesses respectively.

When we read the charge of the learned trial judge the reason for the jury's action becomes quite apparent. The court belittled the testimony of the experts, telling the jury that *"You and I know each side can get all the experts they need by paying them"*, and that he was "always skeptical" about their "great records",— in other words, about their reputations and experience in their respective occupations. He said that "These

gentlemen are supposed to give you light, help you out", but he proceeded to tell of another valuation proceeding in which he was the judge and where they had "a great array of witnesses" who "were supposed to give me light", but there was a difference in their estimates of $500,000, "so you know how much help I was given. I had to reach up in the clouds *and just grab a figure and make a guess.* That's all that was done in that case." This was followed by the statement: *"You have to make the guess here, not me.* You have to say what the damage was. If these gentlemen have given you any light on this situation, I am very glad, but I can't see where they gave you great light when one said $6,000 and the other says $18,000. They have left quite a wide margin *for you to guess on."* What in effect, therefore, the court told the jury was that *he* had judicially decided a similar case by making a "guess", and *they* were invited to do the same here.*
It need scarcely be said that juries are not to "guess" but to weigh the testimony intelligently and decide the issue in accordance with the law and the evidence. After indicating to the jury that the court did not think much weight need be given to the testimony of the expert witnesses, the court told them that they were "not bound to set aside your common sense in this matter. You have a right to use that and say what you think is the fair market value of this property immediately before and immediately after." It is difficult to see how the exercise merely of the "common sense" of laymen could be relied upon to determine the value of a piece of real estate, and, since the only evidence as to

---

* This would seem to approximate the method employed by Rabelais' "Bridlegoose", who, after carefully reading all the pleadings and hearing the testimony, then decided the issue by the throw of dice.

values was that given by the experts, and since their testimony was severely disparaged by the court, the jury were thereby left with practically nothing upon which to base a finding.

The court also committed error in ridiculing the law. The jury were instructed: "You know these real estate gentlemen. They say they have taken into consideration the market value of other properties in the neighborhood. *That may be the law and it may be common sense and right. I think it is the bunk,* and I am going to tell you why." The court then proceeded by way of "illustration" to say that a price paid for a property many years ago might not represent its present value; moreover, "The man may have been very hard pressed. He may sell the property at the lowest value, or he may sell it above its value because somebody has made him an offer and he thinks he has a good deal and he takes it. So I don't pay too much attention to that. That is only my opinion as to selling prices in the community." To tell the jury that the court regards law applicable to the case as "bunk" was clearly to invite them to disregard it.

In referring to the expert witnesses, the court said: "I know Mr. Brown; I know Mr. Hershberger; I know Mr. Fahnestock. *They are good friends of mine".* While the court then proceeded to deprecate the sincerity and reliability of *all* expert testimony, it would nevertheless seem indiscreet for the court to have referred to some of the witnesses as being his "good friends", and thus perhaps giving them, however unintentionally, greater prestige in the eyes of the jury than that to which the others were entitled. It was also infelicitous on the court's part to state to the jury that "Mr. Brown says this property is damaged to the extent of $18,000. *I want you all to remember that. I am going to ask the foreman particularly to remember those*

*figures, because you have so many of them.* You can help the other members of the jury out by recalling what Mr. Brown said." This was asking the jury to single out Mr. Brown's testimony and to give it special attention as compared with that of the other witnesses, and "particularly to remember" his figure of $18,000, which, incidentally, was the highest amount of damages testified to in the case.

Another of the court's statements of somewhat dubious propriety was that, (the County having admitted that it was not going to put plaintiffs' porch back under any conditions) *"I have had a great sentimental feeling towards porches in my older days,"* and that "There is no use sitting . . . flush with a highway with a great deal of traffic on it. Then a porch isn't too good, but, nevertheless, in my humble judgment I can't help think that a porch has its value. *I rather like a porch, . . ."*

The court told the jury that plaintiffs had the burden of proving how much they were damaged because *"they brought the County into court here."* This somewhat inept expression may have prejudiced the jury into believing that the plaintiffs were in some way at fault in being aggressors who had "brought the County into court".

The charge in some respects was inadequate. The jury were told merely in somewhat cryptic style that they were to say what they thought was "the fair market value of this property immediately before and immediately after. . . . It is simply a question of value before and after." Assuming that this meant before and after the condemnation and as affected thereby, nothing was explained to them as to what the law means by "fair market value",—the price that a willing purchaser would pay to a willing seller as distinguished from a forced purchase or sale,—nor were they in-

structed as to various considerations that frequently enter into a determination of market value.

It is true that defendant took only a general exception to the charge, but such an exception was sufficient under the circumstances, since the charge was basically and fundamentally defective.

Judgment reversed and a new trial granted.